# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM DUN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TRANSAMERICA PREMIER LIFE INSURANCE COMPANY, *et al.*, <br><br> Defendants. | Civil Action No. 19-40 (JEB) |

## MEMORANDUM OPINION

In March 2013, Irmadell Dun, a 79-year-old resident of Bozeman, Montana, tripped on the sidewalk, struck her head, and died within a week from ensuing complications. This case asks whether Dun's five adult children — Plaintiffs William Dun, Irene Dun, Sheryl Dun, Pat Ruggieri, and Dora Mengel — can recover accidental-death benefits from Defendant Transamerica Premier Life Insurance Company, which issued a group insurance policy here in the District of Columbia. Transamerica denied their claim, explaining that Dun's insurance only covered deaths resulting from a motor-vehicle or common-carrier accident, as opposed to any other sort of mishap. In their suit, Plaintiffs not only challenge Transamerica's interpretation of the policy, but they also allege that Defendants Financial Planning Services, Inc. (FPS) and Aegon Direct Marketing Services, Inc. (ADMS), Trustee and Administrator respectively of a trust established to maintain insurance policies including Dun's, breached various trust laws and fiduciary duties owed to Plaintiffs.

Following Plaintiffs' twice amending their Complaint and the case's transfer from the District of Montana, both parties have filed Cross-Motions for Summary Judgment on all claims

1

asserted therein. While the parties' submissions are mired in the weeds of standing doctrine and the law of trusts, these discussions miss the forest for the trees. The case remains, at its core, a straightforward dispute over contract interpretation. Because the Court finds that the deceased's insurance policy did not cover the accident in question, it will grant Defendants' Motion and deny Plaintiffs'.

**I.     Background**

   A.  Factual Background

At the summary-judgment stage, given the Court's ruling, it would typically set out the facts in the light most favorable to Plaintiffs, but that is not necessary here, as the parties generally agree on what happened. See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011). In 2001, Peoples Benefit Life Insurance Company (a predecessor of Defendant Transamerica) developed an accidental-death group insurance policy geared toward the elderly. See ECF No. 97-2 (Def. Statement of Material Facts), ¶¶ 1, 6; see also ECF No. 28 (Second Amended Complaint), ¶ 49 (same). The District of Columbia supplied the requisite regulatory approval of that group policy. Peoples Benefit then issued the approved policy to Defendant FPS in its capacity as Trustee of the Peoples Benefit Group Insurance Trust (now known as Monumental Group Insurance Trust and hereinafter labeled simply "the Trust"). See ECF No. 97 (Def. MSJ), Exh. A (Declaration of Douglas Simino).

First established in 1982, the Trust reduced both administrative and regulatory burdens on the insurer, Peoples Benefit. As to the former, it provided a mechanism by which insurance plans could be administered on a group, rather than on an individual, basis. Id., ¶ 7. This collective administration of insurance policies decreases operating costs by allowing insurers to use group underwriting and impose consistent premium rates and terms of insurance certificates

sold across multiple states.  Id.; see also Simino Decl., Exh. 3 (Agreement and Declaration of Trust) at 1 ("[T]he Trustors desire to establish the said group insurance plans collectively, rather than individually, so as to minimize the costs of operation.").  As to regulatory issues, while neither side offers a complete description, it appears that the Trust provided a mechanism whereby Peoples Benefit could issue a single "master policy," hold that policy in trust in one state, and then supply individual insurance certificates across all fifty states "without dealing with fifty different regulators."  ECF No. 90 (Feb. 14, 2019, Hearing Transcript) at 12.  Defendant ADMS is the current Administrator of the Trust, which is declared under the laws of, and has its principal place of business in, Washington, D.C.  See Def. SMF, ¶ 48; Agreement and Declaration of Trust at 1, 11.

After issuing the group policy to FPS, Transamerica's predecessor began marketing individual insurance certificates, primarily via "direct mail" solicitations.  These materials were sent to prospective customers in a variety of states, including Montana.  See Def. SMF, ¶ 6.  Irmadell Dun, a resident of Bozeman, received one such solicitation — referred to by both parties as the "Flyer" ⎯⎯ most likely in late 2003.  Id., ¶¶ 6, 11.  The Flyer consisted of a double-sided piece of paper with a description of the coverage provided by the policy.  Id., ¶ 7.  It began with the following pitch:

> Motor vehicle deaths are on the rise . . . .  And the older driver is 2 times more likely to be the one who gets hit.  That's why I want you to know about our "Ride and Drive" Accidental Death Insurance Coverage.
>
> It covers you every time you get into your car with $100,000 of protection for just $4.33 monthly.

Def. MSJ, Exh. B (Declaration of Mary E. Pieschel), Exh. 3 (Flyer) at 1.  At the bottom of this first page lay a "tear-off" Enrollment Form that could be used by customers to purchase an

3

insurance certificate. Prospective customers such as Dun were instructed to "Sign Below" on the Enrollment Form to "authorize your new coverage." Id. The words "Yes, I want $100,000 of this Accidental Death coverage" were displayed directly below the signature line on the Enrollment Form. Id.

The Flyer continued on the other side of the page with further information about the insurance. The first section, labeled "[e]veryday travel accident benefits you need now more than ever," declared:

> As motor vehicle deaths continue to rise, this protection covers the very real risks you take every time you get into a car . . . . This 'Ride and Drive' accidental death coverage pays $100,00.00 benefits if you die from a covered injury as a result of: 1) driving a car . . .; 2) riding in a car or as a fare-paying passenger in a common carrier . . .; 3) being struck by any motor vehicle as a pedestrian.

Flyer at 2. This side of the Flyer also outlined "Exclusions" from the policy such as "death caused by . . . intentionally self-inflicted injury[,] . . . the insured having a blood alcohol of .10% [or higher,] . . . any sickness[,] . . . [and] participating in any race or speed contest involving motor vehicles of any type." Id.

Dun, then 70 and a bookkeeper by trade, signed the Enrollment Form on November 7, 2003. See Peischel Decl., Exh. 2 (Enrollment Form); Def. MSJ, Exh. H (Deposition of Sheryl Dun) at 24. Once Peoples Benefit received a signed Enrollment Form, it issued applicants the Insurance Certificate, which set forth the specific terms of coverage and provides the operative insurance contract here. See Pieschel Decl., Exh. 1 (Certificate). The Certificate provided insureds with 30 days to examine it, and if the insured was "not satisfied with his Certificate, he [could] return it" and be refunded any paid premiums. Id. at 1. The Certificate was labeled "Group Accidental Death Insurance Certificate," and it explained that the policy "pays benefits for death due to an accident." Id. The Certificate continued:

4

# PART III: ACCIDENTAL DEATH BENEFIT

> We pay a benefit if an Insured dies as the result of an Injury that occurs from one of the Accident Hazards described below. The Accidental Death Benefit is shown on your Certificate Schedule. Death must occur within 90 days (180 days if this Certificate is issued in New Mexico) of the accident causing the Injury.
>
> **Motor Vehicle Hazard:** This Hazard occurs if an Insured dies as a result of being Injured:
>
> a. while riding in or driving a Private Passenger Automobile;
>
> b. if struck, as a pedestrian, by a Private Passenger Automobile or any other Land Motor Vehicle; or
>
> c. while driving for hire a Land Motor Vehicle.
>
> **Common Carrier Hazard:** This Hazard occurs if an Insured dies as a result of being Injured while:
>
> a. riding as a fare paying passenger on a Common Carrier; or
>
> b. getting on or off a Common Carrier.

Id. at 3.

After enrolling in November 2003, Dun dutifully paid the $4.33 per month she owed under the policy for nearly a decade, remitting almost $500 in total over the remainder of her life. See Def. SMF, ¶ 19; SAC, ¶ 79. During that period, Monumental Life Insurance (formerly Peoples Benefit) sent her a letter dated August 2011 confirming her enrollment in "Motor Vehicle and Common Carrier Accidental Death Benefit Coverage." Def. MSJ, Exh. 7 (Monumental Statement of Insurance Coverage) at 2. On March 8, 2013, Dun tripped and struck her head, dying several days later. See SAC, ¶ 80.

Following her death, Plaintiffs — Dun's five children — filed a claim for $100,000 with Monumental Life (now Defendant Transamerica) under the Certificate. Defendant denied the claim on the ground that Dun's death was not the result of an accident involving a "motor

5

vehicle" or "common carrier" and therefore was "not covered" by the Certificate. See Def. MSJ, Exh. F (Claim Letter from Monumental Life).

B. Procedural History

On December 11, 2015, Plaintiffs filed suit against Defendant Transamerica Premier in Montana state court alleging that it had improperly denied their insurance claim. Transamerica removed the case to federal court in Montana on diversity-jurisdiction grounds. See 28 U.S.C. § 1332. The parties proceeded to discovery, which revealed that the Insurance Certificate at issue had been sold to more than 56,000 people nationwide, only 140 of whom had filed claims for benefits at that time, with only 18 succeeding. See ECF No. 59 (Def. Motion to Transfer) at 5–6. On June 30, 2017, Plaintiffs filed an Amended Complaint, asserting substantially the same claims but attempting to bring a class action against Transamerica on behalf of other certificate holders. See ECF No. 21 (Amended Complaint).

Two months later, Plaintiffs filed a Second Amended Complaint (the operative Complaint here). This pleading continues to allege that Transamerica misconstrued the insurance policy, while also asserting claims against Defendants FPS and ADMS. Plaintiffs explain that they added FPS and ADMS as Defendants because they "learned in discovery" that the insurance purchased by Dun "arose from a trust" and was marketed through the Trust. See SAC, ¶ 1. Plaintiffs' Second Amended Complaint is not easy to decipher. It appears to assert counts for breach of contract, breach of fiduciary duty, breach of trustee duties, and breach of administrator duties, while also requesting an administrative accounting and offering allegations under abstract headings such as "Joint Enterprise and Similar Theories" and "Benefits Owed." Id., ¶¶ 116–23. The Second Amended Complaint also mentions vague "class claims[,]" but at this point, these are the only Plaintiffs. Id., ¶¶ 126–33.

With the case newly focused on FPS and ADMS, Plaintiffs filed a motion to transfer the matter to those Defendants' principal place of business, the District of Columbia. See Def. Motion to Transfer at 9. The Montana court granted that motion, offering this Court its first opportunity to handle a case from Big Sky Country. Following a few more months of discovery overseen by this Court, both sides now move for summary judgment.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and

7

must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

## III. Analysis

In moving for summary judgment, Defendants initially argue that Plaintiffs do not have standing to sue either FPS in its capacity as Trustee or ADMS in its capacity as Administrator. Additionally, on the merits, they assert that there is no genuine issue of material fact as to the validity of the denial of the Duns' insurance claim, which would foreclose Plaintiffs from prevailing on any of the counts alleged in their Second Amended Complaint. The Court will first assure itself of its jurisdiction and, having done so, will turn to the proper construction of the scope of Dun's insurance coverage.

### A. Standing

The Court begins, as it must, by considering its own jurisdiction to hear this case. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998). The doctrine of standing ensures "that federal courts do not exceed their authority" because it "limits the category of litigants empowered to maintain a lawsuit in federal court." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). The "'irreducible constitutional minimum' of standing consists of three elements. The plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. (citation omitted) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). In certain of its permutations, the doctrine can prove muddled. As commentators and jurists alike have observed, the "law of standing is so cluttered and confused that almost every

proposition has some exception." Linda R.S. v. Richard D., 410 U.S. 614, 617 n.4 (1973) (quoting Kenneth Davis, Administrative Law 428–29 (3d ed. 1972)).

In support of dismissal for lack of standing, Defendants argue that Plaintiffs have not identified a "concrete injury fairly traceable" to ADMS or FPS. This is so, they posit, because Dun did not enter into a relationship with these two Defendants, contractual or otherwise. Those companies, Defendants assert, did not market or sell Dun's insurance certificate. In fact, they maintain that the Trust itself is entirely unconnected to insured persons such as Dun and instead simply exists to make it easier for insurance companies to administer such plans. Plaintiffs argue, by contrast, that FPS and ADMS controlled the Trust, which was responsible for paying out the benefits owed them. They also claim insureds (and their descendants) are beneficiaries of the Trust, and that ADMS and FPS therefore stand in fiduciary relationships with Plaintiffs.

Defendants' arguments erroneously conflate the standing and the merits analyses. "Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to filing suit, while the underlying merits of a claim . . . determine whether the plaintiff is entitled to relief." Arreola v. Godinez, 546 F.3d 788, 794–95 (7th Cir. 2008). As the D.C. Circuit has consistently reminded us, "[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." Parker v. Dist. of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd sub nom. Dist. of Columbia v. Heller, 554 U.S. 570 (2008) (quoting Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003)); see also Warth v. Seldin, 422 U.S. 490, 501–02 (1975) (assuming validity of legal theory and factual allegations in complaint for purposes of standing analysis); Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 65 (1976) (Brennan, J.,

concurring) ("The books are full of opinions that dismiss a plaintiff for lack of 'standing' when dismissal, if proper at all, actually rested . . . upon the plaintiff's failure to prove on the merits the existence of the legally protected interest that he claimed.").

Defendants' assertions that Plaintiffs' "erroneous legal arguments" pertaining to the Trust and the fiduciary duties assumed by ADMS and FPS "do not establish standing," ECF No. 10 (Def. Reply) at 4 (emphasis added), are thus inapposite. To be sure, at the summary-judgment stage, the Court no longer need accept the factual allegations in a plaintiff's complaint as true, and a plaintiff must "identify in [the] record evidence sufficient to support its standing to seek review." Sierra Club v. EPA, 292 F.3d 895, 899 (D.C. Cir. 2002); see also Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411–12 (2013) (at summary-judgment stage, party invoking federal jurisdiction must set forth specific facts to establish standing). Yet simply because a plaintiff may not (or even will not) ultimately succeed in persuading a court as to the validity of his legal theories or his factual allegations does not mean he lacks standing. Were it otherwise, "every losing claim would be dismissed for want of standing." Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1092 (10th Cir. 2006) (*en banc*).

The sufficiency of Plaintiffs' demonstration of a "concrete injury fairly traceable to" ADMS and FPS is thus clear at this stage. Assuming "*arguendo*" the merits of Plaintiffs' "legal claim," they were wrongfully denied benefits due to them under their late mother's Insurance Certificate. See Parker, 478 F.3d at 377. Contrary to Defendants' assertion, Plaintiffs need not establish a contractual relationship with all three Defendants in order to establishing standing to sue them. Even if neither FPS or ADMS marketed or sold the insurance coverage, Plaintiffs have pointed to evidence in the record indicating that the funds owed to them were controlled by the Trust, over which both ADMS and PDS shared authority as Trustee and Administrator

10

respectively. For example, the Declaration of Trust dictates that "[t]he Trustee shall make payments from the Trust Funds . . . upon written direction of the Administrator," Declaration of Trust, § 4.3, and that "[t]he Administrator shall have the authority to determine the requirements, which shall be set forth in the policy, with which an individual must comply in order to be eligible for benefits . . . [t]he time for payment of premiums, the premium due date, the amount of contribution required from each insured . . . and other matters relating to benefits." Id. § 5.2.

Taking the facts in the light most favorable to Plaintiffs, ADMS and PDS are responsible for distributing benefits to insured people, and they wrongfully withheld benefits from Plaintiffs in violation of their various trust responsibilities and fiduciary duties. It may ultimately transpire that Defendants did not owe Plaintiffs any duties, fiduciary or otherwise, but such disputes over the legal contours of their relationship are not properly resolved on standing grounds.

B. Insurance Coverage

While Plaintiffs have established standing to sue, their victory will be short lived because their case fails on the merits. At bottom, Plaintiffs' claims, whether characterized as breach of contract or breach of fiduciary duty, rest on a single premise: that Dun's insurance policy is properly construed as covering not just accidental death via motor vehicle or common carrier, but instead death resulting from any accident. If her insurance also covered her slip and fall, then Defendants may have breached the terms of the contract or violated their fiduciary duties to Plaintiffs (assuming the disputed premise that they maintained any such duties to begin with).

As a threshold matter, this case is ripe for resolution on summary judgment. Indeed, both parties have so moved, and there are no remaining disputes outside of the proper interpretation of language contained within the contracts. The parties further agree that District of Columbia law should apply, presumably because the Trust Agreement states that it will be governed by D.C.

11

law, and, in any event, there is no conflict between D.C. and Montana law as to the contract interpretation principles at stake. See Def. MSJ at 12 n.8; see also ECF No. 104 (Pl. MSJ) (citing to D.C. law); Norris v. Norris, 419 A.2d 982, 984 (D.C. 1980) (District honors choice-of-law provisions "as long as there is some reasonable relationship with the state specified").

In the District, "an insurance policy is a contract between the insured and the insurer." Rockhill Ins. Co. v. Hoffman-Madison Waterfront, LLC, 2019 WL 4860874, at *6 (D.D.C. Sept. 30, 2019) (alterations omitted) (quoting Travelers Indem. Co. v. United Food & Commercial Workers Int'l Union, 770 A.2d 978, 986 (D.C. 2001)). In the context of insurance disputes, as in all cases involving contract interpretation, "whether a genuine issue of material fact is in dispute will depend generally upon whether the contract is ambiguous." Nat'l Trade Prods. v. Info. Dev. Corp., 728 A.2d 106, 109 (D.C. 1999). Resolution of the question of a contract's ambiguity "is a question of law," making summary judgment appropriate "when the agreement is unambiguous and where there is no question as to the parties' intent." Id. (quoting Gryce v. Lavine, 675 A.2d 67, 69 (D.C. 1996)); see also Hedgeye Risk Mgmt., LLC v. Heldman, 196 F. Supp. 3d 40, 47 (D.D.C. 2016) ("Whether a contract is ambiguous is a legal question for the court, not a factfinder, to decide.") (internal quotation marks omitted).

"A contract is not rendered ambiguous merely because the parties disagree over its proper interpretation." Parker v. United States Tr. Co., 30 A.3d 147, 150 (D.C. 2011) (quotation marks omitted). Instead, a contract is ambiguous when "the provisions in controversy are[] reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." Id. (quotation marks omitted). "Conversely, a contract is unambiguous when a court can ascertain the contract's meaning by merely looking at the contract." Potomac Elec. Power Co. v. Mirant Corp., 251 F. Supp. 2d 144, 149 (D.D.C. 2003). In other words, if the Court can

12

determine that the scope of Dun's insurance coverage is unambiguous based on the terms of the policy alone, and if Plaintiffs have not offered any material evidence that would call that interpretation into question, it can resolve the dispute without conducting a trial. Indeed, Plaintiffs have not explained what a factfinder would do here, given that contract interpretation is a matter of law and that there are no disputes of material fact.

To ascertain the scope of this contract, the Court looks to "the written language embodying the terms of an agreement." Hedgeye Risk Mgmt., 196 F. Supp. 3d at 47 (quoting Aziken v. Dist. of Columbia, 70 A.3d 213, 218–19 (D.C. 2013)). In doing so, it conducts a "reasonableness inquiry to determine what a reasonable person in the position of the parties would have thought the disputed language means." Potomac Elec. Power Co., 251 F. Supp. 2d at 149. In recognition of the nature of insurance contracts, which are generally drafted by an insurer with subject-area expertise and tendered to those "often without technical training," ambiguities in an insurance policy are "construed against the insurer." Chase v. State Farm Fire & Cas. Co, 780 A.2d 1123, 1127 (D.C. 2001). At the same time, the Court may not "indulge in forced constructions to create an obligation against the insurer." Id. (quotation marks omitted). "If an insurance contract states in plain terms what is covered, then 'the man or woman in the street' should be able to understand what is said." Whiting v. AARP, 637 F.3d 355, 362 (D.C. Cir. 2011).

Plaintiffs contend that the Flyer, Enrollment Form, and Insurance Certificate, when considered in conjunction, supply convoluted and contradictory language that could be interpreted to provide coverage for any accidental death. As to the Certificate, Plaintiffs concede that Part III "could be read . . . to include a restriction limiting coverage to motor vehicle[s]." Pl. MSJ at 35. This section, however, is "buried on page 3," while the first page is "filled with

13

language informing the consumer that she is purchasing an ordinary accidental death policy." Id. at 31, 35. For example, the Certificate was labeled "Group Accidental Death Insurance Certificate," and at the bottom of the first page, it declared that "this coverage is limited to accidents and does not pay for death due to sickness. Coverage stops at age 80." Id. at 30–32; see also Certificate at 1 (same). They also note that the Enrollment Form, which served as an application for coverage, stated above the signature line, "Yes, I want $100,000 of this Accidental Death Coverage," id. at 29, as opposed to, say, "Accidental Motor-Vehicle Death Coverage." Pointing to these sentences, Plaintiffs suggest that an average person could reasonably conclude that the policy covers deaths resulting from any accident. They also argue that Dun may not even have received the Certificate because no party has recovered a copy of it, and she was known to be a meticulous record keeper. See Sheyl Dun Dep. at 23:15–16 ("She was meticulous on how she filed.").

Although Plaintiffs' position is certainly not frivolous, the Court believes that their interpretation is too strained to carry the day. Looking to the plain terms of the contract, a reasonable person would have to conclude that the coverage is limited to motor-vehicle and common-carrier deaths. The Certificate clearly establishes that the policy pays "a benefit if an Insured dies as a result of an Injury that occurs from one of the Accident Hazards described below." Certificate at 3. It then defines the covered accidents as either a "Motor Vehicle Hazard" or a "Common Carrier Hazard." Id. While Plaintiffs point to more general provisions in other sections of the Certificate, the Court must "strive to give reasonable effect to all [the contract's] parts and eschew an interpretation that would render part of it meaningless." Dist. of Columbia v. Young, 39 A.3d 36, 40 (D.C. 2012) (internal quotation mark omitted); see also Hunt Constr. Grp., Inc. v. Nat'l Wrecking Corp., 587 F.3d 1119, 1121–22 (D.C. Cir. 2009) ("In

14

reading contract provisions we take the contract's entirety into account, seeking to give all its provisions effect.") (quoting Steele Founds., Inc. v. Clark Constr. Grp. Inc., 937 A.2d 148, 154 (D.C. 2007)). In addition, it is "a familiar principle of contract interpretation, that 'specific terms and exact terms are given greater weight than general language.'" Wash. Auto Co. v. 1828 L St. Assocs., 906 A.2d 869, 880 (D.C. 2006) (quoting Restatement (Second) of Contracts § 203(c) (1981)). Giving "effect" to the specific language in Section III, which defines the sorts of accidents covered by the insurance, clearly limits the policy's coverage to those hazards specified therein — *viz.*, motor-vehicle and common-carrier accidents.

While Plaintiffs argue that the word "only" should have been added before these descriptions — *e.g.*, "the policy will pay a benefit <u>only</u> if an Insured dies as a result of an Injury that occurs from one of the Accident Hazards described below" — a contract is not ambiguous merely because its terms "could have been clearer." Dist. No. 1—Pac. Coast Dist. v. Travelers Cas. & Sur. Co., 782 A.2d 269, 274 (D.C. 2001) (quotation marks omitted). Put differently, that one of the parties could imagine a hypothetical contract describing the coverage with perfect clarity does not render the actual contract ambiguous.

Even if the Certificate were ambiguous, or if Plaintiffs were able to support their unsubstantiated theory that Dun never received it, the "breach of contract claim still fails because the promotional materials clear up any ambiguity." Whiting, 637 F.3d at 363 (looking to promotional materials at motion-to-dismiss stage to resolve any potential ambiguity regarding insurance policy). The Enrollment Form encouraged the applicant to sign up for "<u>this</u> Accidental Death Coverage," a clear reference to the coverage described by the attached Flyer. See Enrollment Form (emphasis added). The Flyer proclaimed that "<u>Motor vehicle deaths</u> are on the rise." Flyer at 1 (emphasis added). It further advertised the "'<u>Ride and Drive</u>' Accidental Death

15

Insurance coverage," which "covers you every time you get into your car." Id. (emphases added). This description of the coverage, limiting it to vehicular accidents, was repeated on the back of the Flyer, along with this further explanation: The "'Ride and Drive' accidental death coverage pays $100,000 benefits if you die from a from a covered injury as a result of: 1) driving a car . . . 2) riding in a car [or] . . . 3) being struck by any motor vehicle as a pedestrian." Id. at 2. Far from being "deceptive," or introducing ambiguity, as Plaintiffs would suggest, the marketing materials served to further clarify the terms of the policy.

Finally, Plaintiffs have not offered any admissible evidence that might call into question the Court's construction of the insurance policy. They cite only to the inadmissible hearsay statement made by Sheryl Dun that Irmadell at one point expressed an impression that the insurance covered all accidental deaths. See Dun Dep. at 43–45; see also United States *ex rel.* Barko v. Halliburton Co., 241 F. Supp. 3d 37, 53 (D.D.C. 2017), aff'd, 709 F. App'x (D.C. Cir. 2017) (explaining that no genuine dispute of material fact was created where none of proffered evidence was admissible). Dun's state of mind, in any event, is entirely irrelevant to the Court's inquiry because under D.C. law we analyze a contract "based on the meaning which common speech imports, and not based on any analysis of how [the insured] herself would read the contract." Whiting, 637 F.3d at 361.

Given that the contract and accompanying promotional material unambiguously limit themselves to the construction supplied by Defendants, summary judgment must be granted to them not only on Plaintiffs' breach-of-contract claim but also on their tort counts. This is so because Plaintiffs do not point to any improper conduct, beyond the language of the insurance materials, or any redressable injury, beyond the denial of their insurance claim, that could sustain those additional causes of action. See Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080,

16

1089 (D.C. 2008) (tort claim independent of contract claim is viable only where plaintiff can establish "an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit"); Whiting, 637 F.3d at 363 (in case resulting from denial of insurance coverage, claim based on plaintiff's status as third-party beneficiary of agreement between insurer and marketer redundant of breach-of-contract claim); Klayman v. Judicial Watch, Inc., 255 F. Supp. 3d 161, 173 (D.D.C. 2017) ("[I]t cannot be that the conduct is tortious because of some duty imposed by the contract itself."). Because Plaintiffs' common-law claims rise and fall together, the Court will grant Defendants' Motion for Summary Judgment as to them all.

C. Statutory Claims

Finally, Plaintiffs' Opposition asserts never-before-mentioned claims under the D.C. Insurance Code, D.C. Code § 31-2231.04, and D.C. Consumer Protection Procedures Act, D.C. Code § 28-3904. See Pl. MSJ at 37–38. The Court can make quick work of these statutory claims because it is "well-established in this district that a plaintiff cannot amend his Complaint in an opposition to . . . summary judgment." Jo v. Dist. of Columbia, 582 F. Supp. 2d 51, 64 (D.D.C. 2008). As these claims are not properly pleaded (or pleaded at all), they do not stand in the way of summary judgment.

**IV. Conclusion**

For these reasons, the Court will grant Defendants' Motion for Summary Judgment and will deny Plaintiffs'. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: March 5, 2020